**In re Larry Austin CRISWELL, Emilia Criswell, Debtors.**

**Ronald and Patricia LISK, Plaintiffs,**

v.

**Larry Austin CRISWELL, Defendant.**

**Bankruptcy Nos. 84–0068–R, 83–01721–R.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

July 31, 1985.

Ross W. Krumm, Charlottesville, Va., for plaintiffs.

James R. Sheeran, Richmond, Va., for defendant.

MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter came before the Court on the complaint by Ronald and Patricia Lisk ("Lisks") seeking a determination of nondischargeability with respect to a debt alleged to be owed by the debtor, Larry Austin Criswell ("Criswell"). A trial was held on November 8, 1984 at which time the Court heard the evidence. At the conclusion of the trial, the Court took the matter under advisement, directed the parties to file briefs and set a date for final argument after submission of the briefs. On January 25, 1985, the Court heard the argument of counsel. Upon motion of the plaintiffs, the Court by Order dated May 8, 1985 allowed the plaintiffs to amend the complaint to conform to the evidence and add an additional count alleging nondischargeability under 11 U.S.C. § 523(a)(6). After consideration of the briefs filed by

the parties as well as the evidence adduced at the trial and the argument of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

At the outset, the Court feels obliged to note that the law does not provide redress for every wrong or injury suffered by individuals in the ordinary course of their business. This is even more true when the laws relating to bankruptcy and dischargeability are applied. Such a case presents itself for decision today. Were it not for poor legal advice at the inception of the contract where the rights of the plaintiffs could have been protected, and were it not for what this Court considers an inexcusable professional act of omission on the part of legal counsel for the plaintiffs at the closing of the transaction, this Court would likely not now have to sift through these unfortunate circumstances. As will be more fully developed hereafter, this case is more one of attorney ineptitude than it is of intentional wrongdoing on the part of the debtor. However, the Court's decision is not predicated as a matter of law solely on the incompetence of counsel. Conduct of counsel is but one of a number of facts leading to the Court's conclusion.

The defendant in this proceeding, Larry A. Criswell, filed a joint Chapter 7 petition with his wife, Emelia Criswell, in this Court on November 21, 1983. On the same day, Criswell and Associates, Inc. (the "Corporation") also filed a Chapter 7 petition in bankruptcy in this Court. Larry and Emelia Criswell were at that time the only shareholders in the Corporation. The debtor in this proceeding, Larry Criswell, was president of the Corporation and Emelia Criswell was vice-president/secretary/treasurer. The Corporation was run principally by Larry Criswell. The Corporation was engaged in the business of residential home construction and land development and operated principally in Spotsylvania County, Virginia. The Corporation is a Virginia corporation.

Ronald C. Lisk works for the United States Navy. He was transferred in late 1982 to the Washington, D.C./Northern Virginia area. In December, 1982 the Lisks began looking for a home to purchase in the Fredericksburg, Virginia area. The Lisks contacted the Corporation in response to an advertisement in the newspaper advertising homes for sale at a favorable interest rate with financing available. The Lisks met with one of the Corporation's salesmen and selected a floor plan and a lot in Greenwood Estates which they desired to have the Corporation build for them if a price acceptable to both parties could be agreed upon. The Corporation's price of $110,000 exceeded the Lisks self-imposed maximum of $100,000 and thus the Lisks decided to investigate the market for previously owned homes as opposed to a new home.

In January, 1983 the defendant Criswell contacted the Lisks and asked if they were still interested in having a home built by the Corporation. Criswell indicated that the home could be built for a price less than $110,000. Subsequently, Criswell met the Lisks in an effort to reduce the contract price to a figure closer to $100,000. At this meeting, Criswell informed the Lisks that the biggest variable in the cost of construction was interest and expenses to be paid on the Corporation's construction loan to build the house and that if the Lisks could advance funds for the building of their home, the attendant expenses and interest costs for the amount advanced could be eliminated thereby reducing the overall price of the home. The Lisks assumed that the Corporation would not encumber the real estate with a construction loan deed of trust if construction funds were advanced by them to the Corporation.

On January 25, 1983 the Lisks, after consultation with an attorney who reviewed and approved the proposed terms, entered into a contract with the Corporation for the construction and purchase of a residential, single-family dwelling on a certain lot of real property which the Corporation did not as yet own. The total contract price was $102,000. The contract was a

standard realtor's form contract with several addenda which set out the draw schedule pursuant to which the Lisks would advance and the Corporation would obtain a total of $59,000 including the initial down payment as part of the draw schedule. The initial down payment to the Corporation on January 25, 1983 was $3,264.00. Thereafter, the contract called for payment of $35,700 on March 1, 1983, payment of $16,000 on March 15, 1983, and payment of $4,036 on April 1, 1983. Together these payments totaled $59,000. The balance of the contract would be due on closing at which time title would be transferred to the Lisks. The original closing date was set for May 1, 1983.

The contract of January 25, 1983 contained two pertinent provisions which the Lisks have asserted they relied upon in the transaction. The first provision is contained in paragraph 9 of the contract which states in part: "[t]he property shall be sold free of encumbrances...." The second provision is found in paragraph 10 of the contract which provides that: "[t]he Seller agrees to convey the above property by General Warranty Deed with the usual covenants of title...." In contrast, Criswell relies on paragraph 17 of the contract as follows: "... this contract contains the final and entire agreement between the parties hereto, and that they shall not be bound by any terms, conditions, statements, warranties or representations, oral or written not herein contained."

The actual draws by the Corporation indicate an additional $10,000 draw on March 1, 1983. This was not in fact an actual draw. The proposed lender for the Lisks at that time, Dominion Bankshares, had demanded that the Lisks advance $69,000 to the Corporation before they were willing to finance the balance. The testimony indicated that the defendant, Criswell, suggested that the Lisks sign a check to the Corporation for $10,000 in return for a check from the Corporation for $10,000 so that on paper it would appear that the Lisks had advanced an additional $10,000.[1]

At the time the parties entered into the agreement, the property was titled in the name of a third party with whom Criswell had an oral agreement to purchase at some future time in the event Criswell found a buyer for the property. Criswell agreed that he would purchase the property in order to fulfill the contract with the Lisks. The deed conveying the property to the Corporation was recorded on May 6, 1983. (*See* Plaintiff's Exhibit 2). The transfer of the property to the Corporation occurred five days after the original scheduled closing date. The contract provided that at the purchaser's option if closing did not occur by May 1, 1983, the Lisks could cancel the contract and have all deposits refunded or the Corporation would pay any additional costs to get the Lisks a 12% loan. The Lisks chose not to cancel the contract and to proceed, having the Corporation pay the additional amounts necessary to acquire for the Lisks a new loan commitment. The

---

**1.** It should be noted for the record that the settlement statement (Plaintiff's Exhibit 6) reflects that the parties closed the transaction and dispersed funds as if in fact $69,000 had been advanced by the Lisks. Thus, the Corporation and Criswell came away from the transaction with less than the full purchase price even allowing for the adjustments as reflected on the statement. When questioned about the $10,000 discrepancy at trial, Mr. Lisk testified that it had something to do with the fact that the Corporation had not completed the road accessing the Lisks' home. However, the Court is unable to glean from the contract in evidence any agreement to build a road by the Corporation to be included in the $102,000 purchase price of the home. (*See* Plaintiff's Exhibit 1). Rather, it would appear that any agreement respecting road construction other than when graveling and asphalting would be accomplished was separate from the January 25, 1983 contract under consideration herein. Finally, it would appear that there is no evidence that at closing the parties discussed offsetting against the price of the home the cost of finishing the road. Accordingly, the Court finds that the Corporation and Criswell received less than the full contract price for the home at closing without a satisfactory explanation of why the discrepancy in the settlement statement was not corrected by the parties. This is not to say that the Corporation or Criswell was entitled to anything at settlement, but merely that the settlement statement was obviously wrong and the Lisks were the only parties at closing aware of the error.

Lisks were able to obtain subsequent financing from the Nationwide Lending Group for the balance of the contract price.

On the same date that the deed conveying the property to the Corporation was recorded, a deed of trust was executed on behalf of the Corporation by the defendant, Criswell, for the benefit of John Hanson Savings and Loan, Inc. ("John Hanson") to secure a construction loan to the Corporation in the amount of $81,600. The note secured by the deed of trust became due and payable September 6, 1983. The construction loan also had a draw schedule and the stipulations are that the Corporation drew $43,000 on May 6, 1983, $21,580 on May 23, 1983, and $13,700 on July 25, 1983 for a total of $78,550. All of these sums were in addition to the payments made to the Corporation by the Lisks pursuant to the January 25, 1983 contract.

The evidence does not reveal whether all of the funds advanced by John Hanson went into building the home for the Lisks. However, the evidence revealed that at least $122,000 in costs went into the building of the home which the Corporation was selling for $102,000. Criswell testified that he could not remember whether all of the funds from John Hanson were used in the construction of the Lisks' home. However, it would appear that the $59,000 provided by the Lisks in addition to the $78,550 provided by John Hanson exceeded by about $15,550 the actual cost incurred by Criswell in building the home. Thus, it would appear that some of the aforesaid funds were diverted to other uses of the Corporation.

The contract of January 25, 1983 did not by its terms prohibit the Corporation from obtaining a construction loan or placing a deed of trust on the property which was the subject of the contract. However, Ronald Lisk testified that he was led to believe by the defendant that as a result of the Lisks financing $59,000 of the total purchase price, a construction loan would not be necessary. Mr. Lisk testified that the whole purpose of their financing the project was to avoid the necessity for a construction loan and its attendant expenses. The Court cannot make a finding of fact that the parties agreed that no deed of trust would be placed on the property to be sold to the Lisks. The contract is silent on this point.

Construction of the home went very slowly through June and July. The Lisks wished to close by July 25, 1983 in order to take advantage of government payment of their closing costs. On July 16, 1983 the defendant, Criswell, realizing that the construction was not proceeding adequately and that cost overruns had made the project unprofitable, decided to breach the contract and refund the Lisks their advances. On July 21, the defendant Criswell went on a two-week vacation with his wife leaving the management of the Corporation in the hands of a vice-president, Richard G. Beattie. Criswell gave Beattie a power of attorney in order to have the authority to close on several homes which were nearing towards completion within the two-week period while Criswell would be away. Criswell specifically instructed Beattie to close on the other homes but not to close on the Lisks' home. Criswell then left for vacation.

Despite Criswell's explicit instructions to Beattie not to close on the Lisks' property, Beattie proceeded to obtain a certificate of occupancy and put the property in condition to close. Beattie testified that he did so in order to avoid a possible lawsuit over a breach of the Lisks' contract as a result of another delay in closing. Criswell had not informed Beattie or the other vice-president, Hudson Harland, of the reason why the Lisks' property was not to be closed.

The closing occurred on August 4 and 5, 1983.[2] At the closing, the Lisks were rep-

2. The statement of facts contained in the brief filed on behalf of Criswell indicates that closing occurred on August 3 and 4, 1983. The confusion on the part of counsel for Criswell is undoubtedly based on the misstatement at trial by Mr. Lisk that the Thursday when the closing began was August 3, when in fact the Court takes judicial notice that the first Thursday in August was the 4th. (Defendant's Brief at p. 5; Transcript at p. 40).

resented by the American Legal Center. The first day was primarily concerned with negotiation of an appropriate amount to be held in escrow necessitated by a walk-through of the property that revealed that the Corporation had not completed many of the items on the punchlist. Thus, the Corporation agreed that it would either complete the construction within thirty days of closing or the Lisks would have the option to have the work finished by another subcontractor using the funds from the escrow account. The Lisks proposed that the escrow account be in an amount exceeding $14,000. However, the final figure agreed upon by the Lisks and the Corporation was $7,930 to be held in escrow by the American Legal Center.

The deed conveying the property from the Corporation to the Lisks was signed "Larry Criswell, Pres./s/Richard G. Beattie, V.P." At the conclusion of the closing on August 5, 1983, the Lisks were in possession of a deed conveying the property to them from the Corporation by general warranty deed with English covenants of title. The Corporation had been tendered a check in the amount of $19,519.27 as the balance due under the contract after settlement. Present at the closing was the attorney of record for the Lisks, Mr. Charles C. Cowsert, III ("Cowsert") an employee of the American Legal Center.

Mr. Cowsert's participation in the closing was minimal. The evidence revealed that a title insurance binder was on the table in the offices where the closing was being conducted which contained the results of Mr. Cowsert's title search on the property. Mr. Cowsert testified that in searching the title to the property he discovered two encumbrances, one of which was the John Hanson deed of trust for $81,600. The other encumbrance was a $16,000 lien of the FDIC which the American Legal Center had worked to have satisfied and released. Mr. Lisk testified that he noticed the title insurance binder on the table and the reference to the $16,000 encumbrance and asked Cowsert if he was sure that the property was free of encumbrances. Mr. Cowsert answered in the affirmative.

Cowsert testified that he knew of the John Hanson deed of trust lien on the property and that he failed to inform the Lisks at closing of the encumbrance because he assumed that the encumbrance would be satisfied out of the loan proceeds from the closing. Cowsert admitted that he had not read the Lisks' contract for the purchase of the property prior to the closing and was not familiar with the details of the transaction. Had he been familiar, it would have been apparent that the $19,519.27 should not have changed hands at closing and could not possibly have satisfied the existing encumbrance on the property. Mr. Lisk testified that he would not have closed on the property had he known of the $81,600 deed of trust. Cowsert admitted that he knew of the encumbrance and that as the Lisks' attorney, he committed a professional act of omission by not reading the contract and becoming familiar with the details of the transaction nor informing the Lisks of the encumbrance and inquiring whether or not the sellers intended to satisfy the lien.

Following closing, the check for $19,519.27 along with the file containing the seller's closing documents were returned by Harland and Beattie to the law offices of Paul T. Scott, the attorney for the Corporation, in Fredericksburg, Virginia for safekeeping over the weekend. Criswell returned from his vacation on August 8 to discover that the Lisk property had in fact been closed. Criswell testified that he subsequently relieved Beattie of his responsibilities at the Corporation in part because Beattie had failed to close on the other properties which he had been instructed to close and had closed on the one property he had been instructed not to close. Criswell took the check for $19,519.27 and deposited the check into the Corporation's general account and told Beattie that there was a problem with the Lisks' closing but that he would rectify the same.

The deed from the Corporation to the Lisks was not recorded until August 11, 1983, a week after closing. The deed was

not immediately recorded because Cowsert forgot to do so. Further, the Nationwide deed of trust was not recorded until six weeks after closing. In addition to the John Hanson encumbrance on the property, the Lisks discovered subsequent to closing the existence of other encumbrances in the form of mechanics or materialmen's liens on the property. Cowsert testified that it did not occur to him to assure that he had received mechanics lien waivers to protect his clients, the Lisks. Scott, the attorney for the Corporation, testified as to the standard of care among attorneys in Fredericksburg, Virginia with respect to real estate transactions. Scott testified that the standard of care among attorneys in the area required that disbursement of funds placed in escrow for real estate transactions be made after instruments go to record and not before. Here, disbursement was made prior to the instruments going to record. In addition, Scott testified that he would advise the purchaser not to go to closing if the gross proceeds paid by the purchaser at closing were insufficient to discharge all the liens in order to make the title marketable. Scott testified that marketable title meant title free and clear of liens that would affect the title or conveyability of the property. Finally, Scott testified that if he were advising a client entering into a construction contract with a contractor, by which the purchaser was to advance construction costs, he would advise that the purchaser protect himself by having title to the real estate be placed in his own name before advancing any funds for construction and that the right to file mechanics liens be waived prior to each draw so that the purchaser would be more fully protected as to his advances.

The deed of trust in favor of John Hanson was never released and remains a lien against the property. The deed of trust executed by the Lisks to secure their permanent loan to finance the property is now subordinate to the lien in favor of John Hanson. The parties have stipulated that from August 6, 1983 forward, there was never enough cash in the account of the Corporation to refund the Lisks the money they had paid pursuant to the contract. This was true even though Criswell testified that he closed on approximately seventeen houses on which he made an overall net profit after the Lisk transaction.

The Lisks filed this complaint for a determination of nondischargeability seeking actual damages in the amount of $96,025 plus $150,000 in punitive damages which the plaintiffs pray be determined to be nondischargeable under 11 U.S.C. § 523. The complaint consists of five counts. Count One asserts a cause of action against Criswell for obtaining money from the Lisks by false pretenses, false representations, or actual fraud pursuant to § 523(a)(2)(A). Count Two maintains that Criswell perpetrated a fraud and defalcation while in a fiduciary capacity under § 523(a)(4). Count Three argues that Criswell's conduct was nondischargeable under § 523(a)(4) as embezzlement. Count Four seeks a determination of nondischargeability under § 523(a)(4) for larceny. Finally, Count Five of the complaint seeks $150,000 in punitive damages if the Court should find that Criswell's conduct was intentional and outrageous.

Criswell filed on April 27, 1984 a motion to dismiss Count Five of the plaintiffs' complaint on grounds that this Court had no jurisdiction to award punitive damages in a complaint to determine the dischargeability of a debt. In a Memorandum Opinion entered by this Court on November 1, 1984 the Court denied the defendant's motion to dismiss holding that this Court did have jurisdiction to award punitive damages in a complaint pursuant to § 523. *See In re Criswell,* 44 B.R. 95 (Bankr.E.D.Va. 1984).

Upon motion made on January 16, 1985, the Lisks sought to amend their complaint to conform to the evidence at trial and include an additional unnumbered count based on 11 U.S.C. § 523(a)(6). By Order dated May 8, 1985, the Court granted the plaintiffs' motion and the complaint was amended. The additional count asserts an allegation of nondischargeability based on

a willful and malicious injury to the Lisks and/or their property.

Criswell maintains (1) that in order for the Lisks to succeed in their complaint they must pierce the corporate veil which exists to shield Criswell from liability for the acts of the Corporation, and (2) that one or more of the elements of each cause of action contained in each count of the plaintiffs' complaint are not present and, therefore, the defendant must prevail. Accordingly, the Court must first determine whether the corporate veil need be pierced, and if so, whether the corporate fiction can be set aside under the circumstances of this case. Once it is determined whether Criswell could be held liable for any of the counts in the plaintiffs' complaint, the Court must determine whether or not the plaintiffs have met their burden of proof with respect to each claim asserted in the complaint.

## CONCLUSIONS OF LAW

The transaction of which the plaintiffs herein complain is not an isolated transaction. The event or events which may give rise to a determination of liability and non-dischargeability occur over a defined period of time from December, 1982 through August, 1983 until the filing of bankruptcy in November, 1983. As a result, the Court feels for purposes of organization that it is desirable to examine the allegations in the complaint and the defenses with reference to four separate time frames within this period. These would be (1) the events, statements, and transactions surrounding the contract formation, (2) the period of time in the spring of 1983 when the Corporation was receiving monies from the draw schedule in the contract, acquiring title to the realty, and placing a construction loan deed of trust on the property with its own draw schedule, (3) the events leading up to and including the closing on August 4 and 5, 1983, and (4) the events which transpired post-closing. The Court will examine each of these four time periods in light of the allegations contained in each count of the complaint. However, it must first be decided whether the corporate veil need be pierced and, if so, whether it can be pierced.

### I.

### *Piercing the Corporate Veil*

In the case at bar, the Court concludes that in order for the plaintiffs to succeed on any of the five counts in the complaint or on the unnumbered count added thereto, the plaintiffs must succeed in piercing the corporate veil which would shield Criswell from the debts of the Corporation. The necessity for piercing the corporate veil is evidenced by the fact that Criswell was acting at all times as an officer of the Corporation and in his capacity as president of the Corporation. The contract for construction of the Lisks' home was executed by Criswell in his corporate capacity. Accordingly, the debts of which the Lisks complain arise from acts of the Corporation and in order to reach the defendant in this proceeding, the plaintiffs must convince this Court to disregard the corporate fiction.

The leading case in the Fourth Circuit on the imposition of individual liability on an officer/shareholder of a corporation is the case of *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976).[3] In *DeWitt*, the United

---

3. The Lisks cite several cases for the proposition that Criswell may be held liable for any wrongdoing with respect to the Lisks on the basis that Criswell "actively participated" in the wrongdoing. *In re Nicoll*, 42 B.R. 87, 90 (Bankr.N.D.Ill. 1984); *In re Schwartz*, 36 B.R. 355, 359 (Bankr. E.D.N.Y.1984); *In the Matter of Penning*, 22 B.R. 616, 619 (Bankr.E.D.Mich.1982). To the extent that these cases might stand for the proposition that a showing of active participation in the commission of some wrongdoing standing alone is sufficient to pierce the corporate veil, this Court is of the opinion that such a showing falls short of that required by *DeWitt* and is accordingly disapproved of to that extent. Although *DeWitt* was a diversity case in which South Carolina law was applicable, the *DeWitt* standards have been applied by the Fourth Circuit in reinstating a bankruptcy court decision in Virginia not to pierce the corporate veil. *See In re County Green Limited Partnership*, 604 F.2d 289, 292 (4th Cir.1979), *rev'g* 438 F.Supp. 701

States District Court for the District of South Carolina held in applying South Carolina law that a corporation's president would be liable as shareholder for the debts of the corporation and pierced the corporate veil. On appeal, the Fourth Circuit affirmed the decision of the district court and set out with great clarity the standards which must be applied whenever a creditor seeks to disregard the corporate fiction and hold a shareholder of the corporation liable.

■ The ability to look behind the corporate fiction and hold the shareholders liable for the debts of the corporation is to be exercised with reluctance and caution. *DeWitt,* 540 F.2d at 683. The burden of proof on the issue of whether or not the corporate veil should be pierced rests on the party seeking to establish liability on the shareholder. *Id.*

■ The Fourth Circuit adopted the instrumentality theory for disregarding the corporate shell and holding the principals of the corporation liable. The court held that a conclusion to pierce the corporate veil is a question of fact to be determined after examining all the circumstances in the case. Although proof of fraud in and of itself may be sufficient to pierce the corporate veil, it is not absolutely necessary in order to disregard the corporate fiction. Rather, the Fourth Circuit discussed several factors which the courts may use to determine whether or not the corporate veil should be pierced. In this regard, the Fourth Circuit stated:

> One fact which all the authorities consider significant in the inquiry, and particularly so in the case of the one-man or closely-held corporation, is whether the corporation was grossly undercapitalized for the purposes of the corporate undertaking. [citations omitted].... Other factors that are emphasized in the application of the doctrine are failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor

corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. The conclusion to disregard the corporate entity may not, however, rest on a single factor, whether undercapitalization, disregard of corporation's formalities, or what-not, but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness.

*DeWitt,* 540 F.2d at 685–87.

■ In the case at bar, Criswell and Associates, Inc. was a closely-held corporation owned by Criswell and his wife. At the time the Corporation filed its petition in bankruptcy, Criswell and his wife were the sole shareholders. The two shareholders held all of the offices of the corporation with the exception of two vice-presidents. As president, the defendant Criswell was in total control of the Corporation. None of the homes built by the Corporation could go to closing without Criswell's approval and direction. In fact, Criswell was apparently the only officer who could execute instruments in the name of the Corporation absent execution of a power of attorney. Finally, the record as a whole reveals that Criswell dominated this Corporation and used it as an instrument to carry on his business of residential land development and home construction. However, these facts standing alone would not justify a decision by this Court to pierce the corporate veil.

Although there is evidence that Criswell and Associates, Inc. was a closely-held corporation dominated by its two shareholders, the Court cannot find from a review of the transcript of the trial any evidence with respect to any of the factors in *DeWitt* save an allegation of fraud. The Court, as the remainder of this decision will forth-

---

(W.D.Va.1977). Virginia, like South Carolina, apparently follows the "instrumentality" theory of piercing the corporate veil. *See, e.g., Lewis*

*Trucking Corporation v. Commonwealth,* 207 Va. 23, 32, 147 S.E.2d 747, 753–54 (1966).

with address, has been unable to find any fraud on the part of Criswell which would justify piercing the corporate veil. In addition, there is no evidence of either the failure to observe corporate formalities, the non-payment of dividends, a siphoning of funds by Criswell, the non-functioning of other officers or directors, the absence of corporate records, or the fact that the corporation was merely a facade for the operations of the dominant stockholders, any combination of which might give this Court cause to disregard the corporate fiction. With respect to the insolvency of the corporation, there is some evidence in the form of inference which might be attributed to the fact that the corporation filed bankruptcy on November 21, 1983. This fact is, however, insufficient without more to establish the insolvency of the Corporation during the spring and summer of 1983.

■ Finally, the Court finds no evidence that the Corporation was grossly undercapitalized for the purposes of the corporate undertaking. The Fourth Circuit in *DeWitt* stated that " '[t]he obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter ... during the corporation's operations.' " *DeWitt*, 540 F.2d at 686. The Court finds that cases interpreting *DeWitt* in this circuit have examined the nature of the debtor's business in determining whether or not the corporation is undercapitalized. In *West v. Costen*, 558 F.Supp. 564 (W.D.Va.1983), the district court in Virginia examined whether or not a collection agency was undercapitalized. The court examined the collection agency's prospective liabilities as predictable risks associated with the collection business. The court in *Costen* found that the corporation's capital base of $1,000 with minimal office furniture and no cash reserve amounted to a gross undercapitalization of a business intended to operate as a collection agency. In making that determination the court stated:

> At any rate, undercapitalization is a ground for piercing the corporate veil because it is 'the policy of the law that

shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities.' *Ballentine on Corporations*, 302–303 (1946 ed.).

*Costen*, 558 F.Supp. at 586. Thus, undercapitalization essentially means that there is insufficient unencumbered capital to reasonably meet a corporation's predictable and prospective liabilities in the event they were to arise.

In the instant case, the Court finds that no evidence was tendered at trial on the question of whether the Corporation was undercapitalized. As with the other factors which the Court must consider under the *DeWitt* decision, there is no evidence on which the Court could base a finding that any of the factors were present in this case. Accordingly, the Court must conclude that the Lisks have failed to carry their burden of proof in establishing the facts upon which the Court might pierce the corporate veil. For this reason, the Court is precluded from assessing liability on Criswell in his personal bankruptcy for any acts or omissions which occurred while he was a shareholder and an officer of the Corporation. Notwithstanding the foregoing, the Court finds it necessary to address the allegations of wrongdoing and fraud raised by the complaint inasmuch as this Court's conclusion that it cannot pierce the corporate veil relies in part on a finding that Criswell committed no fraud in his dealings with the Lisks. Thus, it is to the allegations of the complaint that the Court now turns.

## II.

### A. *Count One: False Pretenses, False Representations, or Actual Fraud.*

The Lisks have maintained throughout this proceeding that their transaction with Criswell was tainted by misrepresentation and fraud. From the time of the formation of the contract when the Lisks understood that a construction loan by Criswell would not be necessary through August of 1983 when Criswell deposited the check for $19,519.27 into the general corporate account

of the Corporation, the Lisks maintain that Criswell's conduct has been such as to support a finding that Criswell obtained money, property, or services from the Lisks by false pretenses, false representation, or actual fraud which would allow this Court to deny a discharge to Criswell with respect to any debt incurred by such conduct under 11 U.S.C. § 523(a)(2)(A).[4]

■ The law is well-established in this jurisdiction that the elements of proof in a case under 11 U.S.C. § 523(a)(2)(A) must be demonstrated by clear and convincing evidence. *In re Hazelwood,* 43 B.R. 208, 211 (Bankr.E.D.Va.1984); *In re Carneal,* 33 B.R. 922, 925 (Bankr.E.D.Va.1983) (citing *Brown v. Buchanan,* 419 F.Supp. 199 (E.D. Va.1975)). These elements are: (1) that the debtor made the representations; (2) that at the time of making the representations he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as a result of the representations having been made. *In re Hazelwood,* 43 B.R. at 211; *In re Carneal,* 33 B.R. at 925.

The first time period the Court must examine is that from late December, 1982 through the date the contract was executed on January 25, 1983. The Lisks have not alleged that in the formation of the contract there was either fraud in the factum or fraud in the procurement of the contract. Thus, this Court can find no fraud in the actual formation of the contract absent any evidence to the contrary and, therefore, the contract is binding and enforceable against the parties.

The next pertinent time period in the transaction comes in the spring of 1983 when the Corporation (1) begins receiving money from the Lisks pursuant to the draw schedule in the contract, (2) takes

title to the lot on which it intends to build the Lisks' home, and (3) places a deed of trust from a construction loan on the property and begins receiving funds from the loan proceeds. It is here that the Lisks maintain that they were misled falsely into believing that no construction loan would be placed on their property. Mr. Lisk testified that the sole purpose of the Lisks financing the construction was to avoid the placing of a construction loan on the property and the attendant interest charges which would raise the price of the house. Accordingly, the Lisks maintain that Criswell falsely represented at the time the contract was entered into that no construction loan or deed of trust would be necessary for the Lisks' transaction.

■ The Court has made a finding that there were conversations between the Lisks and Criswell with regard to advancement of funds by the Lisks for the construction of the Lisks' home, but the Court has not made a finding that the Corporation agreed as a *quid pro quo* not to place a construction loan deed of trust on the property. Those conversations arose at the time of the negotiation of the purchase price when the Corporation agreed to reduce the price of the home if the Lisks would fund a portion of the cost of construction. Any representations allegedly made by Criswell at that time indicating that a construction loan would be unnecessary never became formalized into an agreement not to place a deed of trust on the property. For this and other reasons hereinafter discussed, the Court cannot conclude that Criswell's action in placing a deed of trust on the property on May 6, 1983 was fraud within the meaning of § 523(a)(2)(A).

■ In the first instance, the representation which must be made by the debtor in order to fall within the meaning of

---

**4.** § 523(a)(2)(A). Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

§ 523(a)(2)(A) must be one of existing fact and not an expression of opinion. *See De-Jarnette v. Thomas M. Brooks Lumber Co., Inc.*, 199 Va. 18, 27–28, 97 S.E.2d 750, 757 (1957) ("It is regarded as fundamental that fraud cannot be predicated upon what amounts to a mere expression of an opinion."). In this case, the evidence is clear that although Criswell may have indicated by word or deed to the Lisks that a construction loan (and therefore a deed of trust) would not be necessary on the property if the Lisks advanced the construction costs, this Court is of the opinion that this representation by Criswell was merely an opinion, expectation or declaration of intention at the time of entering into the contract and there is nothing whatsoever either in the evidence at trial or in the contract itself which would indicate that the parties ever agreed that the Corporation would as a part of the contract definitely not put a deed of trust on the property. Moreover, it may well be that Criswell never intended to take a construction loan on the property when he informed the Lisks that if they advanced the construction costs a construction loan would not be necessary. Thus, even if this Court were to find that the representations involved a material existing fact, the Lisks have not carried their burden of clear and convincing evidence to prove that at the time of making the representation Criswell knew that it was false and that he would in fact have to borrow money to finish the Lisks' home.

■ The Lisks are also precluded from arguing successfully that they relied on the representation even if in fact the Lisks had been able to prove that Criswell represented that he would not borrow money and place a deed of trust against this particular piece of property. Paragraph 17 of the contract states in pertinent part that: "this contract contains the final and entire agreement between the parties hereto, and that they shall not be bound by any terms, conditions, statements, warranties, or representations, oral or written not herein contained." (Plaintiff's Exhibit 1). This clause in the contract is commonly known as a "merger" clause which is intended to integrate the contract. Integration of a contract refers to the merging of all prior and contemporaneous agreements between the parties into the written document which embodies the contract. Murray, *Murray on Contracts*, § 104 (2d rev. ed.). As such, the parties agree to be bound only by the contract and not by any agreements, statements or representations not contained therein. Inasmuch as the Lisks agreed in the contract that Criswell would not be bound by any terms, conditions, statements, warranties, or representations not therein contained, the Lisks are now precluded by the parol evidence rule from asserting that they relied on such representations. *Id.* at § 105–08. In this regard, the Court finds that the Lisks should be held to their contract inasmuch as they were represented by legal counsel at the time they entered into the contract and the evidence indicated that their counsel reviewed and approved the contract as written.

The next relevant time period which this Court must consider is that leading up to and including the closing held on August 4 and 5, 1983. The Lisks maintain that Criswell and the Corporation represented in the contract that the property would be sold free of encumbrances and that the seller agreed to convey a general warranty deed to the Lisks. In particular, paragraph 9 of the contract states that:

[t]he property shall be sold free of encumbrances, except as aforesaid; title shall be good of record subject to easements, covenants, conditions and restrictions of record: otherwise, the deposit is to be returned and sale declared off at the option of the Seller unless the defects are of such character that they may readily be remedied by legal action. In this event that legal steps are necessary to perfect the title, such action may be taken promptly, by and at the Seller's expense whereupon the time herein specified for full settlement by the Purchaser shall be extended for the period necessary for such action.

Paragraph 10 of the contract states that "[t]he Seller agrees to convey the above

property by General Warranty Deed with the usual covenants of title, the same to be prepared at the expense of the Seller, and the Seller reserves the right to approve mortgagee." The Lisks further maintain that although Criswell was not present at closing, he ratified the acts of the Corporation upon his return on August 8, 1983.

The Court finds that on August 4, Beattie executed a deed on behalf of Criswell and Associates, Inc. conveying the property to the Lisks by general warranty deed with English covenants of title. The English covenants of title are set out and prescribed in the Virginia Code. *See* Va.Code §§ 55–70; 55–71 to –74 (Repl.Vol.1981). In particular, Virginia Code § 55–70 provides that a general warranty deed with English covenants of title shall have those covenants set out in §§ 55–71 through 55–74, inclusive. Section 55–72 provides for a covenant that the property is free of encumbrances. Va.Code § 55–72 (Repl.Vol. 1981). The Court also finds that the property in question was sold and conveyed to the Lisks on August 4, 1983 with an existing deed of trust in favor of John Hanson in the amount of $81,600. The Court further finds that the execution of the warranty deed was a representation that the property was free and clear of encumbrances and that the representation was in fact false.

■ However, the Lisks cannot be said to have reasonably relied on the general warranty deed or the contract. Although the testimony is undisputed that the Lisks were not in fact aware of the existence of the deed of trust in favor of John Hanson on the date of closing, and thus, there was some actual reliance on their part, this Court finds under the circumstances that their reliance was not also reasonable. Reasonable reliance is an element of a cause of action under § 523(a)(2)(A). *In re Landon*, 37 B.R. 568, 570 (Bankr.N.D.Ohio 1984).

In *Landon*, the plaintiffs executed a contract to purchase real estate in Ohio. The contract stated that only one mortgage currently encumbered the property. The seller had falsely represented this to be the case when in fact there was a second mortgage on the same parcel of property. The plaintiffs sought to have the debt for damages declared nondischargeable. The Court held that the seller's failure to disclose constituted a false misrepresentation and proved wrongful intent. However, the court found against the plaintiffs on the ground that their reliance was not reasonable. The court stated:

> There has been no showing that if a title search had been done that the second mortgage would not have appeared.... The [p]laintiffs were in a superior position to protect their interests and had a duty to do so. Their failure to adhere to the basic standards of their profession [as realtors] is conduct which indicates that they did not reasonably rely on the contract.

*Id.* at 571.

■ In the case at bar, the sellers were represented at closing by Charles Cowsert, an attorney from the American Legal Center. Cowsert testified that he had done a title search on the property for the Lisks and had discovered two encumbrances on the property. The first encumbrance was a $16,000 deed of trust in favor of FDIC which had been previously paid and which was later released on the records. Cowsert also testified that he knew of the $81,600 deed of trust on the property at closing. A title binder had been prepared mentioning both deeds of trust as encumbrances against the property. The title binder was among those documents present at the closing and the Lisks saw that binder. Ronald Lisk admitted seeing the $16,000 deed of trust scheduled in the title binder and asked Cowsert if he was certain that the property was free of encumbrances. Cowsert assured him that it was.

As attorney for the Lisks, Cowsert admitted at the trial that he was responsible for a professional act of omission by not informing the Lisks of the $81,600 encumbrance on the property they were purchasing. Cowsert admitted that he had not read the Lisks' contract with the Corpora-

tion and was unfamiliar with its details. Cowsert stated in court that he just assumed that the encumbrance would be released from the proceeds of the sale.

In the Commonwealth of Virginia, an attorney is the agent of his client. *See Virginia Electric & Power Co. v. Bowers,* 181 Va. 542, 547, 25 S.E.2d 361, 363 (1943). With respect to that agency, the Court finds that the normal rules of agency apply. One of the most elementary rules of agency is that the knowledge of an agent is imputed to his principal. *See Eitel v. Schmidlapp,* 459 F.2d 609, 615 (4th Cir. 1972); *Fulwiler v. Peters,* 179 Va. 769, 776, 20 S.E.2d 500, 502 (1942); *State Bank of Pamplin v. Payne,* 156 Va. 837, 843, 159 S.E. 163, 165 (1931). This is true whether the agent communicates his knowledge to the principal or not. *Payne,* 156 Va. at 843, 159 S.E. at 165.

In this case, Cowsert as attorney for the Lisks examined the title and had knowledge of the existence of an $81,600 encumbrance. By an admitted professional act of omission in representing the Lisks, Cowsert failed to inform them of the existing encumbrance. Cowsert was not familiar enough with the details of the transaction to know that the proceeds were not contemplated to be used for satisfaction of the $81,600 encumbrance since apparently neither Beattie nor Harland nor the Lisks knew of the existence of the encumbrance. The knowledge of Cowsert is therefore imputed to the Lisks and they are estopped to assert that they relied on the general warranty deed with English covenants of title or the contract dated January 25, 1983. As a result, the Lisks' claim under § 523(a)(2)(A) with respect to the acts of

the Corporation at closing must fail for lack of reasonable reliance.[5]

In addition, however, the Lisks maintain that when Criswell returned from vacation on August 8, 1983, he ratified the unauthorized act of Beattie and that his knowledge of the encumbrance makes out a cause of action under § 523(a)(2)(A). The facts are that Criswell, when he left for vacation on July 21, 1983, executed a power of attorney to Beattie in order to allow him to close on houses which were nearing completion during the two weeks in which Criswell would be absent. The undisputed testimony is that Criswell also left specific instructions for Beattie not to close on one house—that being the Lisks'. As an agent of Criswell under the power of attorney, Beattie had a duty under Virginia law to follow his principal's instructions. *General Fidelity Life Insurance Co. v. Bank of Callao,* 206 Va. 582, 587, 145 S.E.2d 212, 216 (1965) ("Where a principal's instructions to his agent are clear, precise and imperative, they should be strictly followed...."). Beattie, however, breached his duty to Criswell by failing to follow instructions and by closing on the Lisks' home. The act of Beattie was unauthorized and would not bind Criswell absent ratification.

Under Virginia law, a principal can be held to have ratified the unauthorized act of an agent by accepting the benefits of the agent's unauthorized act. *See Southern Amusement Co., Inc. v. Ferrell-Bledsoe Furniture Co., Inc.,* 125 Va. 429, 99 S.E. 716 (1919). The Lisks maintain that Criswell accepted the check for $19,519.27 and that this ratification related back to the date of the execution of the deed. This

---

**5.** The Lisks maintain that under Virginia law they are entitled as purchasers to rely on the seller's covenant against encumbrances and the fact that the John Hanson deed of trust may have been recorded is not such notice as would bind them in an action against the seller for breach of the covenant. Although the Lisks may correctly state the law, it does not help them here. It may be true that the fact that the deed of trust is recorded would not, by a theory of constructive notice, work to bar an action by a grantee of real property against his immediate grantor for breach of the covenant against en-

cumbrances. However, in this case we are not concerned with an action for breach of the covenant against encumbrances, but rather we are concerned with a nondischargeability action under § 523(a)(2)(A) of the Bankruptcy Code in which there is imputed notice as a result of the Lisks' attorney's knowledge of the encumbrance. Accordingly, the Lisks could not have reasonably relied on the covenant against encumbrances contained in the general warranty deed for purposes of an action under § 523(a)(2)(A).

Court is of the opinion that even if it were found that Criswell's knowledge of the encumbrance and his acceptance of the benefits was a ratification which related back to the execution of the deed on August 4, 1983, the Lisks must still fail because they could not have reasonably relied on the deed or the contract. Because of Cowsert's knowledge of the encumbrance which is imputed to the Lisks, the Court is unable to find that the Lisks could have reasonably relied on the contract or deed in the face of such knowledge. *See Landon,* 37 B.R. at 570–71. Accordingly, the plaintiffs have failed to establish a cause of action in fraud or false misrepresentation with respect to the events surrounding the closing and Criswell's alleged ratification of Beattie's unauthorized act of closing.

▮ The final time period which the Court must consider is that which occurred after the closing. The evidence is that Beattie and Harland took the seller's closing documents and the $19,519.27 check to the law offices of Paul Scott for safekeeping over the weekend until Criswell returned from vacation. On Monday, August 8, 1983, Criswell was informed by Beattie that the transaction with the Lisks had closed and that the check was at the offices of Scott. Subsequently, Criswell deposited those funds into the general corporate account. The issue is whether or not Criswell's retention of those funds and deposit of them into the corporate account with knowledge of an encumbrance amounted to a fraudulent concealment which would give this Court cause to deny dischargeability pursuant to § 523(a)(2)(A). This Court finds that the debtor's failure to disclose an encumbrance constitutes a false representation within the meaning of the Bankruptcy Code. *Landon,* 37 B.R. at 570.

▮ Again, however, the Lisks must fail in their attempt to hold Criswell liable for fraud. In the first instance, as discussed above, the Lisks' reliance on Criswell's concealment was not reasonable in light of their attorney's actual knowledge of the encumbrance and their imputed knowledge by virtue of the agency. More-

over, one of the elements which must be proved to make out a case under § 523(a)(2)(A) is that "[t]he requisite fraudulent intent must be shown to have existed at the time the debtor obtained the money...." *In re Leger,* 34 B.R. 873, 878 (Bankr.D.Mass.1983). Beattie's testimony on direct examination included *inter alia,* the following question and answer:

Q. Did you have any discussions with Mr. Criswell upon his return concerning the closing?

A. It was more him discussing that there was some problem with that particular closing, and that whatever problems there were, he would rectify or take care of.

Transcript at p. 137. What must be shown in a cause of action under § 523(a)(2)(A) is that the debtor's fraudulent intent existed at the time he concealed a pre-existing fact so as to have the intent to deceive the creditor and the fraudulent intent must also be shown to have existed at the time the debtor obtained the money. *Leger,* 34 B.R. at 878. Thus, in addition to failing to prove reasonable reliance, the Court also concludes that the testimony of Beattie indicates that Criswell had not formed a fraudulent intent at the time they discussed the closing and he obtained the money. The evidence is clear from Beattie's testimony that Criswell intended to rectify or take care of the problem with the Lisks' closing. The fact that he may subsequently have decided to keep the money thereby causing injury to the Lisks may be wrongful in and of itself, but it is not clear and convincing evidence that Criswell held the requisite fraudulent intent at the time he obtained the money on his return from vacation. If the intent is formed *after* receipt of the money, the debtor might be liable for conversion under 11 U.S.C. § 523(a)(6) but not for *"obtaining"* money by fraud under 11 U.S.C. § 523(a)(2)(A).

Accordingly, for that reason and for the reason that reasonable reliance was not shown, the Court must conclude that the plaintiffs have failed to make out a cause of action against Criswell for his conduct

post-closing. Moreover, inasmuch as the plaintiffs have failed to make out a case under § 523(a)(2)(A) with respect to any of the pertinent time periods involved in the transaction, Count One of the complaint should be denied.

### B. Count Two: Fraud or Defalcation While Acting in a Fiduciary Capacity.

The Lisks have maintained in Count Two of their complaint that Criswell stood in a fiduciary capacity to the Lisks and that a fraud and defalcation occurred when the general warranty deed was executed and delivered to the Lisks at closing without releasing the encumbrance on the property. Fraud or defalcation while acting in a fiduciary capacity states a cause of action under 11 U.S.C. § 523(a)(4).[6] This Court has had occasion in the past to discuss what is necessary in order to make out a case of fraud or defalcation under § 523(a)(4). The principal fact which must be established is that the debtor was acting in a fiduciary capacity *vis-à-vis* the creditor. In this regard, the term "fiduciary" is to be construed narrowly to mean only those fiduciary obligations which arise as a result of a technical or express trust and does not include an obligation imposed under a trust implied in law. *See In re Barwick*, 24 B.R. 703, 705 (Bankr.E.D.Va. 1982); *In re Rigsby*, 18 B.R. 518, 520 (Bankr.E.D.Va.1982); *In re Weidman*, 18 B.R. 249, 251 (Bankr.E.D.Va.1982). Moreover, "[t]he trust must have existed independent and prior to the incident which created the debt." *Barwick*, 24 B.R. at 705.

In the Lisks' post-trial brief and at oral argument on January 25, 1985, counsel for the Lisks admitted that there was no express trust to be found in this case. This Court agrees with counsel's assessment of the facts. We have in this case only an arm's length transaction between purchaser and seller. No technical or express trust exists in this case. Although Criswell in his capacity as an officer of the Corporation acted in a fiduciary capacity with respect to the Corporation, the fiduciary capacity did not extend to the Lisks. Accordingly, Count Two of the complaint should be denied.

### C. Count Three: Embezzlement.

Count Three of the plaintiffs' complaint maintains that Criswell is liable to the Lisks under a theory of embezzlement pursuant to 11 U.S.C. § 523(a)(4). The Lisks maintain that this Court's decision in *In re Rigsby*, 18 B.R. 518 (Bankr.E.D.Va.1982) is controlling. In that case, this Court held that the elements of an embezzlement were "... (1) a trust or fiduciary relationship, (2) that the property claimed embezzled is embraced within the meaning of the statute, (3) that it came into the possession and care of [the] accused by virtue of his employment, (4) it is property of another, (5) that his dealing therewith constituted a fraudulent conversion or appropriation of same to his own use, and (6) such was with the intent to deprive the owner thereof." *Id.* at 520–21 (citation omitted). The Lisks maintain under this decision that they can establish a trust relationship by the imposition of a constructive trust. They also maintain that with respect to the second element there is no statute in force; that with respect to the third element Criswell received the money by virtue of his employment as an officer of the Corporation; that it was the Lisks' property; and that Criswell's dealing constituted a fraudulent conversion with the intent to deprive the Lisks of their property.

Subsequent to the decision in *Rigsby*, this Court adopted the definition of the United States Supreme Court in *Moore v. United States*, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895) with respect to embezzlement. Embezzlement is defined as "...

---

**6.** § 523(a)(4). Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

[t]he fraudulent appropriation of property by a person to whom such property has been intrusted or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner...." *Id.* at 269–70, 16 S.Ct. 295; *see In re Barwick*, 24 B.R. at 706.

■ In examining the four pertinent time periods again for indicia of embezzlement, the Court finds that the only property of the Lisks which came into the hands of Criswell at the time of the contract formation in January of 1983 was the $3,264 down payment pursuant to the contract. However, there can be no embezzlement here for there is no evidence of any fraudulent conversion of that property to Criswell's own use. The only evidence is that this money was used in the construction of the Lisks' home. Moreover, as stated in *Matter of Storms*, 28 B.R. 761 (Bankr.E.D.N.C.1983), "[w]here the parties' conduct indicates a debtor-creditor relation, funds that come into the hands of the debtor belong to him and his subsequent use of them is not embezzlement." *Id.* at 765.

With respect to the time period in the spring of 1983 when Criswell received advancements of funds from the Lisks for the construction of their home, there again is no evidence of anything but a debtor-creditor relation between the parties and no evidence of any fraudulent conversion or appropriation to Criswell's own use. Thus, there can be no embezzlement with respect to the funds advanced by the Lisks totaling $59,000.

With respect to the placing of the deed of trust and the receipt by Criswell of construction draws on the John Hanson loan, this was not the property of the Lisks and again no evidence has been elicited to show that Criswell appropriated any of the funds received on the loan for his own use. By failing to show that Criswell appropriated the property to his own use, the plaintiff's embezzlement charge must fail. *See Rigsby*, 18 B.R. at 521; *In the Matter of Walker*, 7 B.R. 563, 565 (Bankr.M.D.Ga.1980).

With respect to the closing and the time period immediately after the closing in which the Corporation received a check for $19,519.27, the only evidence before the Court is that Criswell deposited these funds into the Corporation's own general account. Again, plaintiffs' count for embezzlement must fail for the inability to demonstrate by clear and convincing evidence anything other than the existence of a debtor-creditor relation or that the debtor fraudulently converted the property to his own use. This Court believes that within the meaning of § 523(a)(4) property which lawfully comes into the possession of a debtor must be used for his own personal use as opposed to the use for which it was intended or, as in this case, the corporate use.

Accordingly, neither the Corporation nor Criswell embezzled $19,519.27 upon closing or upon Criswell's receipt of the money because there was no fraudulent conversion of the property to Criswell's own use and those funds were rightfully due and owing the Corporation under the contract. Consequently, the plaintiffs have failed to establish a claim for embezzlement pursuant to § 523(a)(4) and Count Three should be denied accordingly.

D. *Count Four: Larceny.*

■ The plaintiffs maintain in Count Four of their complaint that this Court should deny dischargeability to any debt determined to be owed by Criswell to the Lisks on the grounds that Criswell committed larceny within the meaning of 11 U.S.C. § 523(a)(4). Larceny is defined as the "fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner." *In re Graziano*, 35 B.R. 589, 594 (Bankr.E. D.N.Y.1983). Larceny differs from embezzlement only in "the manner in which the funds or property come into the possession of a party." *Id.; see also Moore*, 160 U.S. at 269–70, 16 S.Ct. at 295.

■ As is apparent from the foregoing discussion with respect to embezzlement,

all of the funds advanced by the Lisks to Criswell for construction of the home as well as the $19,519.27 advanced by the Lisks at closing all came into the hands of Criswell and the Corporation lawfully pursuant to the contract. At the time of the down payment on January 25, 1983 through the last draw under the contract, all funds were lawfully obtained by the Corporation and Criswell. This fact precludes this Court from finding that any larceny existed with respect to these funds. The same is true with respect to the loan proceeds from the John Hanson transaction. As a result, the plaintiffs have failed to establish a claim for larceny pursuant to 11 U.S.C. § 523(a)(4) and Count Four should be denied.

### E. Unnumbered Count: Willful and Malicious Injury.

This Court by Order dated May 8, 1985 allowed the plaintiffs to amend their pleadings to conform to the evidence to add an unnumbered count alleging nondischargeability pursuant to 11 U.S.C. § 523(a)(6).[7] This provision would allow the plaintiffs to seek a determination of nondischargeability if they can show (1) an injury, (2) caused by the debtor, (3) to another entity or to the property of another entity, and (4) that was willful and malicious. 11 U.S.C. § 523(a)(6).

■ The plaintiffs have not alleged that there was any willful and malicious injury within the meaning of § 523(a)(6) until such time as Criswell received upon his return from vacation the check in the amount of $19,519.27 which he deposited into the corporate account and, thereafter, failed to release the deed of trust lien encumbering the Lisks' property. Although § 523(a)(6) includes a tortious conversion of property, *In re Hazelwood,* 43 B.R. 208, 213 (Bankr. E.D.Va.1984), none of the funds advanced pursuant to the contract were subject to conversion inasmuch as upon delivery they were no longer property of the Lisks. *See In the Matter of Lambillotte,* 17 B.R. 256, 258 (Bankr.M.D.Fla.1982). Nor would the placing of a deed of trust on the property be a conversion when the contract did not prohibit such an action by the contractor. *See In re Harris,* 8 B.R. 88, 93 (Bankr.M.D. Tenn.1980) (debtors' sale of collateral was not a willful and malicious conversion where no provision in the contract prohibited the sale of the collateral by the debtors). Accordingly, the Court finds that during the periods of contract formation, the construction of the home and the closing, there was no conduct by the debtor which would give rise to a finding of nondischargeability pursuant to § 523(a)(6).

■ The plaintiffs assert that Criswell's retention of the $19,519.27 without releasing the deed of trust on the real estate was a willful and malicious injury to their property entitling them to a determination of nondischargeability. In this case, this Court has previously determined that there was no conversion of the $19,519.27 by Criswell. However, tortious conversion is only one type of "injury" which can be found as a basis for nondischargeability pursuant to § 523(a)(6). *See In re Long,* 44 B.R. 300, 306 (Bankr.D.Minn.1983). The term "injury" is much broader under the Bankruptcy Code as exists today than were comparable provisions under the former Bankruptcy Act. In the Act, § 17(a)(2) provided for the nondischargeability of a "willful and malicious conversion of the property of another." *See Bennett v. W.T. Grant Co.,* 481 F.2d 664, 665 (4th Cir.1973). While § 17(a)(2) was limited to "conversion," § 523(a)(6) contains the much broader language making nondischargeable any "injury" that was willful and malicious.

In the case at bar, Criswell returned from vacation on August 8, 1983 to find that a subordinate had closed on the Lisks' home. This conduct was contrary to Criswell's specific instructions. Criswell knew

---

7. § 523(a)(6). Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

of the existing encumbrance and the fact that it had not been released. With this knowledge, Criswell deposited the Lisks' check for $19,519.27 into the general corporate account and the stipulations are that the money was spent. Thereafter, Criswell with knowledge that the deed of trust would not be released unless he were to do so, failed to contact the Lisks to either (1) rescind the transaction and return their monies paid over, (2) seek to contact John Hanson and release the deed of trust which could be accomplished by either satisfying the underlying note or by putting up other unencumbered property of the Corporation, if any, to substitute for the property of the Lisks.

Although Criswell's conduct post-closing was not entirely innocent, the plaintiffs must prove more than just that an injury occurred to themselves or their property. A plaintiff must show under § 523(a)(6) that the defendant was the cause of the injury. In the case at bar, counsel for the Lisks had done the title search on the property and discovered the deed of trust in favor of John Hanson. However, this fact was not disclosed to the Lisks by their own counsel. Mr. Lisk testified that had he known of the existence of the encumbrance on the property he would not have closed on the transaction. Thus, it would appear from the plaintiffs' own testimony that the cause of the Lisks' "injury" was not in the first instance the actions of Criswell, but rather a result of the Lisks' own ineffectual counsel in failing to advise the Lisks of the existence of the encumbrance.

Moreover, Criswell directed his subordinates not to close on the Lisk transaction. In direct contravention of those orders, Beattie and Harland proceeded to closing on August 4 and 5, 1983. Accordingly, any fault on the part of the Corporation for the Lisks' injury must be laid at the feet of Criswell's subordinates. Although Criswell retained the $19,519.27 received from closing and deposited the same into the Corporation's general account, this Court is of the opinion that the primary cause of the Lisks' injury was incompetence of legal counsel and not the acts of the defendant

Criswell. Because the plaintiff has failed to prove the causation element of § 523(a)(6) by clear and convincing evidence, the Court need not consider whether Criswell's conduct was willful and malicious. Accordingly, the plaintiffs' unnumbered count seeking a determination of nondischargeability under § 523(a)(6) should be denied.

## F. Count Five: Punitive Damages.

In Count Five of the plaintiffs' complaint the Lisks seek punitive damages against Criswell in the amount of $150,000 on the grounds that Criswell's conduct was intentional and outrageous, and, therefore, constituted a willful and malicious injury to the Lisks and their property. The Lisks have asserted in their post-trial brief that punitive damages are appropriate in this case and that Virginia law may be relied upon to establish that liability. The Lisks cite *Lee v. Southland Corp.*, 219 Va. 23, 244 S.E.2d 756 (1978).

This Court finds nothing in 11 U.S.C. § 523 which specifically permits this Court to determine that punitive damages are appropriate in a particular case and thereafter determine the punitive damages assessed are nondischargeable under one of the subsections of § 523. However, Congressional silence is not evidence that Congress sought to exclude the bankruptcy courts from determining punitive damages to be nondischargeable. Other bankruptcy courts have seen no impediment to either considering or awarding punitive damages in a nondischargeability context. *See In re Berberian*, 34 B.R. 580, 583 (Bankr.D.R.I. 1983); *In re Goldberg*, 12 B.R. 180, 185 (Bankr.D.N.J.1981); *see also In re Ertz*, 28 B.R. 1020 (D.S.D.1983).

■ Assuming punitive damages can be awarded, this Court has not previously addressed the issue of which law to apply to determine punitive damages. It would appear from the cases that have either considered punitive damages or have actually granted punitive damages that the courts generally follow state law. *See In re*

*Berberian,* 34 B.R. at 583. This Court concludes that inasmuch as the Bankruptcy Code does not articulate on what conditions punitive damages can be assessed and determined nondischargeable, this Court finds that state law should be followed with respect to the imposition and nondischargeability of a claim for punitive damages. In the context of the case currently before the Court, the applicable law is that of Virginia.

Initially, Virginia law requires as a prerequisite for an award of punitive damages that the Court make an award of compensatory damages. *See Evans v. Newport News Shipbuilding and Dry Dock Company,* 243 F.Supp. 1017, 1019 (E.D.Va.1965); *In the Matter of Victor Distributing Co., Inc.,* 11 B.R. 242, 250 (Bankr.E.D.Va.1981). Additionally, the Virginia Supreme Court has enunciated the standard of conduct which must be met before a Virginia court may assess punitive damages against a party in a civil proceeding. In *Giant of Virginia v. Pigg,* 207 Va. 679, 152 S.E.2d 271, the court stated:

> Punitive or exemplary damages are allowable only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others. They are allowed not so much as compensation for plaintiff's loss as to warn others and to punish the wrongdoer, if he has acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to civil obligations. Willful or wanton conduct imports knowledge and consciousness that injury will result from the act done.... Where punitive damages are asked there must be proof of actual or express malice.... Actual malice is an essential and controlling factor for the recovery of punitive damages. Evil intent cannot be presumed or inferred from mere mistake.

*Id.* at 277. From the foregoing passage it is clear that Virginia law requires a showing of actual malice in order to recover punitive damages. The *Giant* case was

reaffirmed by the Virginia Supreme Court in *F.B.C. Stores, Inc. v. Duncan,* 214 Va. 246, 198 S.E.2d 595 (1973) where the court stated that "legal malice inferred from circumstances is sufficient to support an award of compensatory damages, but an award of punitive damages can be supported only by proof of actual malice." *Id.* at 252, 198 S.E.2d at 600.

The Virginia Supreme Court's use of a legal malice standard, *i.e.,* a "conscious disregard of the rights of others," in *Giant* in discussing the requirement of actual or express malice for punitive damages, was construed by the Fourth Circuit in *National Carloading Corp. v. Astro Van Lines, Inc.,* 593 F.2d 559 (4th Cir.1979). In that case, the Fourth Circuit construed the *Giant* and *Duncan* decisions of the Virginia Supreme Court to mean that a "conscious disregard of the rights of others" could be the equivalent of actual malice. *See National Carloading,* 593 F.2d at 565. This state of affairs was dubbed the "equivalency rule" by the bankruptcy court in *In the Matter of Victor Distributing Co., Inc.,* 11 B.R. 242, 251 (Bankr.E.D.Va.1981). The result is that the law of Virginia requires a finding of actual malice to award punitive damages but that in some instances a conscious disregard of the rights of others may be the equivalent of actual malice.

With respect to the requirement that compensatory damages be awarded before punitive damages can be assessed, this Court has not determined that Criswell and the Corporation are not indebted to the Lisks for breach of contract or breach of the covenant against encumbrances contained in the deed. This Court has no doubt that the appropriate Virginia court would find the debtor and/or his Corporation indebted to the Lisks. Rather, this Court has been unable to conclude that the plaintiffs have established that any debt owed is also nondischargeable in bankruptcy. Due to the fact that the underlying debt is dischargeable, the Court is of the

opinion that it would be inappropriate to assess punitive damages in this case. Any punitive damages assessed by this Court or by a Virginia state court under these circumstances would of necessity also be dischargeable if the underlying debt were dischargeable. Although this reason is sufficient in and of itself to deny a claim for punitive damages in this case, the Court nevertheless also concludes that the plaintiffs have not proven actual malice or its equivalent sufficient under Virginia law to allow this Court to award punitive damages.

 Although the Court is proscribed from awarding punitive damages because the plaintiffs have failed to establish nondischargeability under any count of the complaint or prove actual malice, there are other considerations which would militate against the awarding of punitive damages in this case. The imposition of punitive damages is within the discretion of the Court. *In re Walker*, 7 B.R. 216, 222 (Bankr.D.R.I.1980) (citing *Northern v. McGraw-Edison Co.*, 542 F.2d 1336 (8th Cir.1976), *cert. den.*, sub nom., *McGraw-Edison Co. v. Soper*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1976). The overwhelming evidence before the Court is that the Lisks were represented by counsel at the inception of the contract and at closing. Their attorney at closing, Cowsert, admitted at trial that he was guilty of a professional act of omission by not informing the Lisks of the existence of an $81,600 encumbrance on their property. Mr. Lisk testified that had he known of the encumbrance he would have not closed on the property until it was released. In this respect, the Lisks have been a victim of their own counsel's ineptitude and whatever culpability Mr. Criswell may have in this matter, that culpability would be insufficient to cause this Court to assess punitive damages in light of the circumstances. For these reasons, Count Five of the plaintiffs' complaint should be denied.

An appropriate Order will issue.